UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROBERT CAMPBELL, as the Administrator of the
Estate of Erick Campbell, ROBERT CAMPBELL,
individually, AIDA CAMPBELL, and ERIC
CAMPBELL,

         Docket No.

         **COMPLAINT**

         Plaintiffs,

   - against -

UNITED STATES OF AMERICA,

         Defendant.
-------------------------------------------------------------------X

     Plaintiffs, by their attorneys, HELD & HINES, LLP, complaining of the defendant, hereinafter state and allege as follows upon information and belief:

**PRELIMINARY STATEMENT**

     1.    Plaintiff, Robert Campbell, as Administrator of the Estate of Erick Campbell, on behalf of the Estate of Erick Campbell, and plaintiffs Robert Campbell, Aida Campbell, and Eric Campbell, pursuant to the Federal Tort Claims Act, 28 U.S.C. §§2671-2680, seek monetary damages arising from defendant United States of America's (hereinafter "Defendant" or "United States") negligence and other wrongful acts, that resulted in Erick Campbell's (hereinafter "decedent") wrongful death.

     2.    On December 15, 2017, decedent was shot multiple times and killed by agents of the Federal Bureau of Investigation ("FBI") and police officers of various local jurisdictions operating as part of an FBI Joint Task Force operation.

**JURISDICTION, VENUE AND CONDITIONS PRECEDENT**

     3.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 in that this action arises under the laws of the United States of America and is premised on

the acts and omissions of the defendant acting under color of federal law.

4.     This Court has further subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1346(b) in that this is a claim against defendant United States of America for money damages, accruing on or after January 1, 1945, for wrongful death and personal injuries that were caused by the negligent and wrongful acts and omissions of employees and agents of the United States Government while acting within the scope of their offices and employment, under the circumstances where defendant United States, if a private person, would be liable to Plaintiffs.

5.     Jurisdiction founded upon federal law is proper in that this action is premised upon federal causes of action under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §2671, *et. seq.*

6.     Plaintiffs have fully complied with the provisions of 28 U.S.C. 2675 of the Federal Tort Claims Act and have exhausted their claims by filing the required forms with the defendant and having their claims denied.

7.     Pursuant to the FTCA, 28 U.S.C. §2671, *et. seq.*, Plaintiffs presented their claims to the appropriate federal agencies for administrative settlement under the FTCA. The U.S. Department of Justice assumed responsibility for processing the claim and rendered a decision dated April 24, 2019, denying Plaintiffs' claims.

8.     This action is timely pursuant to 28 U.S.C. §2401(b) in that it was presented to the appropriate federal agency within two years of accrual and this action was filed within six months of the running of the six-month period after Plaintiffs' claim was denied.

9.     Venue is proper in this district pursuant to 28 U.S.C. §§1391(b), 1391(c), and 1402(b) in that decedent's Estate was filed in Westchester County, New York and all, or a substantial part, of the acts and omissions complained of herein occurred within Westchester

County, which is within this judicial district.

10.     The amount in controversy is in excess of $75,000.00.

## THE PARTIES

11.     At all times alleged herein, decedent was a resident of the State of New York.

12.     Pursuant to Decree and Letters of Administration issued to Robert Campbell by the Westchester County Surrogate's Court dated June 12, 2018, Robert Campbell is authorized and empowered to act as a fiduciary of the Estate of Erick Campbell and commence this action on the Estate's behalf.

13.     At all times alleged herein, plaintiffs Robert Campbell, Aida Campbell, and Eric Campbell were and remain residents of the State of Florida.

14.     Plaintiffs Robert Campbell and Aida Campbell are the father and mother of decedent Erick Michael Campbell, respectively.

15.     Plaintiff Eric Campbell is the son and only child of decedent Erick Michael Campbell.

16.     Defendant United States is sued for personal injuries caused by the negligent or wrongful acts or omissions of its employees and agents. Those employees and agents were acting within the scope of their office or employment under circumstances where the United States, if a private person, would be liable to Plaintiffs in accordance with the laws of the State of New York. *See* 28 U.S.C. §1346(b).

17.     Defendant United States is subject to suit for a death caused by the negligent and wrongful acts and omissions of employees and agents of the Government while acting within the course and scope of their office or employment, under the circumstances where the defendant, if a private person, would be liable to the Plaintiff, pursuant to the FTCA.

18.     Defendant United States is also subject to suit for a death caused by the negligent and wrongful acts and omissions of employees and agents of law enforcement persons from local governments acting on behalf of a federal agency in an official capacity under the FTCA, as the term government employees is broadly defined pursuant to 28 U.S.C. § 2671(1).

19.     At all times material to this action, Defendant United States was responsible for the supervision, training and coordination of its employees and law enforcement persons from local governments acting on behalf of a federal agency in an official capacity.

## FACTUAL ALLEGATIONS

20.     Prior to December 15, 2017, defendant United States arranged and initiated a series of law enforcement actions focused on apprehending individual(s) suspected of bank robberies in Westchester County, New York. As part of this action, employees and agents of the United States from the Federal Bureau of Investigation ("FBI") partnered with local law enforcement agencies. These local law enforcement agencies included the City of Yonkers Police Department, the Westchester County Police Department, and the Tarrytown Police Department. At the time of the subject incident, the involved officers from these local law enforcement agencies were acting on behalf of the FBI in an official capacity.

21.     Defendant United States decided to partner with the City of Yonkers Police Department ("YPD") despite the fact that defendant United States was aware of serious systemic deficiencies in YPD's operations, including but not limited to deficiencies in YPD officers' use of excessive and deadly force, that had persisted for over a decade prior to 2017.

22.     In fact, in August 2007, defendant United States launched an investigation into YPD's practices in response to allegations that officers used excessive deadly and non-deadly force, discriminatory policing, and improper stop and search practices by YPD officers that deprive

persons of rights, privileges, or immunities secured or protected by the Constitution and laws of the United States.

23.     On or about June 9, 2009, the United States Department of Justice ("DOJ") sent a letter to the City of Yonkers identifying specific concerns the DOJ had based upon its extensive investigation and review of records to that point, most notably related to YPD's practices and policies in the areas of use of force, citizen complaints, investigations, supervisory oversight, and training.

24.     Dating back to 2000, the City of Yonkers and its officers have been the subject of numerous lawsuits involving the unchecked misconduct of YPD officers. In an April 2014 news article, it was disclosed that "[the City of] Yonkers paid nearly $3 million to litigants in police misconduct cases from 2000 to 2009, according to figures provided to The Journal News following a Freedom of Information Law request. That amounts to about $500 per officer per year on legal matters related to misconduct cases, though *police officials have said that amount is low*, and the figures appear to bear that out." *See* https://www.lohud.com/story/news/local/westchester/ yonkers/2014/04/05/police-misconduct-cases-cost-yonkers-almost-m-years/7368907   (emphasis supplied). Specifically, according to the article, "Yonkers police paid $2,995,523 to settle 48 cases of police misconduct and brutality from 2000 through 2009." That is an average of $62,406.73 per settlement.

25.     In another news article published the same day, it was disclosed that despite two (2) YPD officers having been named in fourteen (14) misconduct lawsuits, they were considered by the Yonkers Police Benevolent Association to be "excellent, excellent cops" and were praised by defendant City of Yonkers for having won awards for their police work. *See* https://www.lohud.com/story/news/local/westchester/yonkers/2014/04/05/yonkers-cops-named

misconduct-lawsuits/7369049.

26.     Thereafter, by Agreement between the U.S. Department of Justice and the City of

Yonkers dated November 14, 2016, effective January 2, 2017 (11 months before the subject

incident), the City of Yonkers was required to maintain use of force policies that *inter alia*:

> a.  Incorporate a use-of-force process that relates the force options available to
>     officers to the types of conduct by individuals that would justify the use of
>     such force, and that teaches uses of other measures where appropriate, such
>     as disengagement, area containment, surveillance, waiting out a suspect,
>     summoning reinforcements or calling in specialized units and that requires
>     the use of a verbal warning before the use of force, when possible;
>
> b.  Require officers to use only the force that is reasonable in light of the
>     resistance encountered and to de-escalate force immediately as resistance
>     decreases;
>
> c.  Require that, to the extent consistent with the safety of the officer and the
>     public, individuals should be allowed to submit to arrest before force is
>     used; and
>
> d.  Recommend that available less lethal alternatives be used by patrol officers.

27.     Despite this Agreement between the United States and the City of Yonkers, prior

to and on December 15, 2017, the City of Yonkers and YPD continued to maintain policies,

procedures and protocols with deliberate indifference to and/or reckless disregard for the rights of

the public.

28.     Despite this Agreement between the United States and the City of Yonkers, prior

to and on December 15, 2017, the City of Yonkers and YPD acted with reckless disregard and

deliberate indifference in their supervision and training of YPD officers, including but not limited

to the supervisors and officers involved in the deadly force used on decedent.

29.     Despite this Agreement between the United States and the City of Yonkers, and the

highly-publicized lawsuits alleging brutality and misconduct by YPD officers, and the City of

Yonkers' failure to meaningfully comply with the Agreement, and defendant United States'

awareness of systemic and intractable deficiencies in YPD's practices, defendant United States decided to conduct a surveillance and arrest operation on December 14-15, 2017, in conjunction with the City of Yonkers' police department and other local police agencies – the Westchester County Police Department and Tarrytown Police Department.

30.     Upon information and belief, defendant United States designed and planned the operation, initiated it, funded it, directed the assignments for it, decided on the tactical procedures, and was responsible for the conduct of the operation, including but not limited to the training, supervision, and coordination of the law enforcement agents involved. The law enforcement agents involved included employees of the United States and employees of local law enforcement agencies who were acting as agents of defendant United States at all material times.

31.     Upon information and belief, prior to December 15, 2017, defendant United States held a briefing with the assigned FBI agents and police officers of the Yonkers Police Department, Westchester County Police Department, and Tarrytown Police Department. Upon information and belief, no "takedown" procedures, use of force protocols, supervision protocols, procedures for vehicle stops, or any other information on how to effectuate the arrest of a suspect were discussed. Upon information and belief, no procedures for emergency medical treatment were discussed nor were any actions taken to ensure an ambulance was near the scene during the course of the operation in the event emergency medical treatment was required. Upon information and belief, defendant United States conducted no formal preparation or training for the law enforcement agents involved in this operation. Defendant United States failed to have proper protocols in place and failed to conduct any training despite its knowledge of the systemic deficiencies in YPD's practices, especially with regard to uses of force and training.

32.     Prior to and on the afternoon of December 15, 2017, law enforcement officers from

the FBI, as well as the City of Yonkers, County of Westchester, and Village of Tarrytown's Police Departments (collectively, the "Government's law enforcement agents"), were positioned in the vicinity of Aqueduct Avenue and Delano Avenue, Yonkers, New York for the purpose of conducting a surveillance operation on a vehicle that had been purportedly reported stolen and used in a bank robbery (hereinafter, the "subject vehicle").

33.     At approximately 3:48 p.m. on the afternoon of December 15, 2017, decedent was observed by the Government's law enforcement agents approaching the subject vehicle and carrying a black duffle bag. This was reported over radio transmissions by YPD Detective Thomas Marello ("Det. Marello"). Decedent was not known to the Government's law enforcement agents nor was he a suspect in any bank robbery at that time.

34.     Then, another Government law enforcement agent reported by radio transmission that he observed decedent enter the subject vehicle, place the duffle bag into the subject vehicle, and then exit the subject vehicle to clear snow from the back window. Decedent did not have the duffle bag with him when he exited the subject vehicle to clear snow from the back window. After clearing snow from the back window, decedent then re-entered the subject vehicle for an unknown period of time and then exited again to continue clearing snow from the windows. Decedent did not have the duffle bag with him as he was clearing snow from the other windows. It is unknown at this time how long decedent was in the subject vehicle, or how long he was outside the subject vehicle clearing snow.

35.     Upon the Government's law enforcement agents observing decedent re-enter the subject vehicle the final time, Special Agent Brendan Kenney ("S.A. Kenney") belatedly, yet hastily, issued an order to move in on the subject vehicle with the intent to arrest decedent.[1] In that

---

[1] At no time did the Government's law enforcement agents have a warrant to arrest decedent.

effort, S.A. Kenney quickly pulled his unmarked vehicle within a few inches of the subject vehicle's rear bumper, while Detective Terence Malone ("Det. Malone") from the Westchester County Police Department converged on the subject vehicle from the front[2]. Purportedly, S.A. Kenney exited his vehicle and yelled to decedent, "show me your hands."[3] S.A. Kenney and Det. Malone both approached decedent with their firearms drawn.

36.     Upon information and belief, S.A. Kenney and Det. Malone did not identify themselves as law enforcement. Upon information and belief, S.A. Kenney and Det. Malone did not activate the lights and sirens on their respective vehicles.

37.     Special Agent Daniel McKenna also approached the subject vehicle with his unmarked vehicle, as did YPD Police Officers Timothy Cooper and Thomas Braig ("P.O. Cooper" and "P.O. Braig," respectively) with their unmarked vehicle.

38.     Sergeant Joseph Barosa ("Sgt. Barosa") and Detective Michael McGee ("Det. McGee") of the Tarrytown Police Department also converge their unmarked vehicle(s) upon the subject vehicle, positioning approximately fifteen (15') feet behind Det. Malone's vehicle. Sgt. Barosa and Det. McGee then exited their car and approach the decedent.

39.     Upon information and belief, S.A. McKenna, P.O. Cooper, P.O. Braig, Sgt. Barosa, and Det. McGee did not activate the lights and sirens on their respective vehicles. Upon information and belief, S.A. McKenna, P.O. Cooper, P.O. Braig, Sgt. Barosa, and Det. McGee did not identify themselves as law enforcement.

40.     Upon information and belief, decedent attempted to drive away as he was in fear

---

[2] The Government's law enforcement agents' statements provided as part of a Critical Use of Force investigation are inconsistent in whether Det. Malone approached the subject vehicle on foot or in a vehicle.
[3] The Government's law enforcement agents' statements provided as part of a Critical Use of Force investigation are inconsistent as to whether and when, if ever, they identified themselves as "police" and that decedent was under arrest.

for his life and safety.

41.     The Cooper/Braig vehicle then rammed the driver's side, front quarter panel of the subject vehicle. S.A. Kenney then returned to his vehicle and rammed the subject vehicle.

42.     At some point, one or more of the Government's law enforcement agents purportedly saw a gun in decedent's hand.[4] S.A. Kenney heard one of the Government's law enforcement agents yell, "gun, gun, gun, he has a gun, he is raising his gun up." S.A. Kenney then heard a gunshot, followed by a series of other gunshots. S.A. Kenney observed the rear window of the subject vehicle explode and shatter. S.A. Kenney thought (incorrectly) that decedent had fired upon Det. Malone and he then fired two (2) rounds at decedent through the subject vehicle's rear door.

43.     Upon information and belief, P.O. Cooper was the first to fire his weapon at decedent. P.O. Cooper of the YPD fired sixteen (16) rounds at decedent, emptying his 16-round magazine; S.A. Kenney fired two (2) rounds at decedent; P.O. Braig of the YPD fired three (3) rounds at decedent; Det. Marello of the YPD fired five (5) rounds at decedent; and Sgt. Mark Wissner of the YPD fired one (1) round at decedent.

44.     The Government's law enforcement agents hit decedent approximately ten (10) times, causing decedent to suffer six (6) penetrating gunshot wounds, four (4) perforating gunshot wounds, and four (4) exit wounds to his left armpit, left shoulder blade, left chest, mid-left back, left medial back, left hip, upper left back, mid-back, left elbow, and left forearm.

45.     At no time did decedent fire a gun at the Government's law enforcement agents.

46.     At no time did decedent aim a gun at the Government's law enforcement agents.

47.     Upon the cessation of gunfire, the Government's law enforcement agents did not

---

[4] The Government's law enforcement agents' statements provided as part of a Critical Use of Force investigation are inconsistent as to whom shouted that decedent was holding a gun or whether decedent was actually holding a gun.

render immediate medical assistance to decedent. Rather, despite decedent being critically injured, but still breathing, the Government's law enforcement agents first searched the subject vehicle and duffle bag. Upon completion of that search, the Government's law enforcement agents removed decedent from the vehicle; however, they did not render immediate medical assistance at that time either. Rather, the Government's law enforcement agents initiated a search of decedent's pants for weapons and then for his wallet for identification. Only after finding decedent's wallet and identification did the Government's law enforcement agents begin CPR and request an ambulance; however, the delay was to extensive.

48.    Rather than initiate a simple traffic stop of decedent, or effect his arrest on either occasion that decedent exited the subject vehicle to clear snow from the rear windshield and then the windows, the Government's law enforcement agents decided to use a dangerous, unnecessary, and unplanned technique which involved "boxing in" the subject vehicle.

49.    By boxing in subject vehicle in this way, the Government's law enforcement agents created an unreasonable risk of harm to decedent and the Government's other law enforcement officers, and the public at large.

50.    Then, in violation of proper protocol, the Government's law enforcement agents approached the decedent with their guns drawn and pointed at decedent and yelled for him to show his hands. Upon information and belief, decedent's window was up but cleared of snow, so the Government's law enforcement agents could see him, but decedent may not have been able to hear them. When the Government's law enforcement agents were within a few feet away (if not less) from decedent's window, the aforesaid Government's law enforcement agents intentionally discharged their firearms approximately twenty-five (25) times at decedent, striking decedent ten (10) times and fatally wounding him.

51.     Decedent did not give the officers any reason to believe he had committed, was committing, or was about to commit a felony. In fact, the Government's law enforcement agents only intended to arrest and charge decedent with criminal possession of stolen property (i.e., the subject vehicle), which is a Class A misdemeanor.

52.     The Government's law enforcement agents' use of deadly force to effectuate a misdemeanor arrest was negligent, excessive, abusive, and grossly disproportionate.

53.     Decedent was declared dead at Montefiore Medical Center, Wakefield Emergency Department, at 4:50 p.m. on December 15, 2017.

54.     Decedent is survived by his son, Eric Campbell, and parents, Robert and Aida Campbell.

55.     As described above, the acts and omissions of the Government's law enforcement agents, acting within the scope of their employment, were negligent and wrongful.

## CAUSES OF ACTION

*Count One: Negligence*
_____

56.     Plaintiffs repeat and re-allege each and every allegation set forth in the prior paragraphs of this Complaint, inclusive, as if fully set forth herein.

57.     Defendant United States, its agents and employees, were negligent in the instance and caused decedent's death by, among other things, failing to create and implement proper procedures for this operation; failing to have a proper plan in place for this operation; failing to adequately supervise the Government's law enforcement agents; failing to adequately train the Government's law enforcement agents; failing to have emergency medical personnel on alert and readily available; failing to have field supervisory personnel at the scene; firing an excessive

number of rounds at decedent; failing to reassess the situation prior to continuing to fire upon decedent; failing to arrest decedent outside of the subject vehicle; and failing to have a proper and reasonable operational plan in place that took into account (a) how, when, and where the Government's law enforcement agents would apprehend a suspect, (b) how, when, and where the Government's law enforcement agents would position their vehicles in effecting an arrest, (c) how, when, and where the Government's law enforcement agents would seek cover in order to avoid crossfire, and (d) minimizing the risk of serious harm to the suspect(s) and the Government's law enforcement agents alike; in that they failed to identify themselves as police officers; failed to activate the emergency lights and sirens in their marked and/or unmarked vehicles prior to and upon engaging decedent; engaged in conduct that unreasonably jeopardized the life of decedent; failed to develop and implement a tactical plan that was reasonable for the situation presented; failed to take reasonable precautions; and acted without caution or care for the safety of decedent and/or the outcome of their actions. The Government's law enforcement agents were under the control and supervision of the United States and working on behalf of the United States and were individually negligent in the execution of this operation.

58.     Defendant has in its employ and/or agency various law enforcement officers, over which it exercised control and supervision. At all times material to this action, Defendant authorized these agents and employees to act for Defendant when they committed the negligent and wrongful acts alleged herein. Defendant's agents and employees accepted the undertaking of acting on behalf of Defendant when they committed the negligent and wrongful acts alleged herein. Defendant had control over its agents and employees when they committed the negligent and wrongful acts alleged herein. Defendant also had control over local law enforcement officers from

the City of Yonkers, the County of Westchester, and the Town of Tarrytown who were acting on behalf of Defendant in an official capacity on a joint task force.

59.    The negligent and wrongful acts of Defendant's agents and employees were committed while acting within the course and scope of their employ and/or agency with Defendant. Thus, Defendant is statutorily liable for the actions of its agents and employees and local law enforcement agents when they committed the negligent acts alleged herein.

60.    As the direct and proximate result of Defendant's negligence, decedent Erick Campbell was shot and killed.

61.    New York law imposes a duty of care that applies to police officers and FBI agents to protect the health and safety of all individuals during the course of an arrest and while in police custody.

62.    The acts and omissions alleged herein constitute breaches of that duty of care with respect to decedent by federal employees and local law enforcement agents while acting in the scope of their office or employment or agency.

63.    Defendant's employees were aware (or should have been aware) that the FBI agents and/or police officers under their direction and control may have to use force, including firearms, during the course of the surveillance and arrest operation.

64.    As alleged above, decedent was shot numerous times and killed during the purported arrest under conditions caused by the negligence of federal employees and local law enforcement agents acting within the scope of their employment.

65.    The employees' breach of their duty of care was a direct and proximate cause and a substantial factor in decedent's pain, suffering, and death.

66.     As a further direct and proximate result of the conduct described herein, decedent's estate incurred expenses for funeral, burial, and other costs pertaining to his death.

67.     As a further direct and proximate result of the conduct described herein, decedent's parents, Robert and Aida Campbell, and decedent's son, Eric Campbell, were caused to sustain loss of services, love, and companionship and other damages pertaining to his death.

68.     The actions or omissions described herein by federal employees and local law enforcement agents under their direction and control constitute the tort of negligence under the laws of the State of New York.

69.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

*Count Two: Assault and Battery*
_____

70.     Plaintiffs repeat and re-allege each and every allegation set forth in the prior paragraphs of this Complaint, inclusive, as if fully set forth herein.

71.     At all material times, Officer Timothy Cooper was an investigative or law enforcement officer acting on behalf of a federal agency in an official capacity, in the service of the United States.

72.     Officer Cooper caused bodily harm to decedent Erick Campbell by shooting and killing decedent while decedent was in his car. The shooting constituted excessive force and was accomplished without the consent and against the will of decedent Erick Campbell.

73.     As a direct and proximate result of Officer Cooper's actions, for which Defendant the United States is responsible, decedent Erick Campbell died.

74.     At all material times, Officer Thomas Braig was an investigative or law enforcement officer acting on behalf of a federal agency in an official capacity, in the service of the United States.

75.     Officer Braig caused bodily harm to decedent Erick Campbell by shooting and killing decedent while decedent was in his car. The shooting constituted excessive force and was accomplished without the consent and against the will of decedent Erick Campbell.

76.     As a direct and proximate result of Officer Braig's actions, for which Defendant the United States is responsible, decedent Erick Campbell died.

77.     At all material times, Detective Thomas Marello was an investigative or law enforcement officer acting on behalf of a federal agency in an official capacity, in the service of the United States.

78.     Detective Marello caused bodily harm to decedent Erick Campbell by shooting and killing decedent while decedent was in his car. The shooting constituted excessive force and was accomplished without the consent and against the will of decedent Erick Campbell.

79.     As a direct and proximate result of Detective Marello's actions, for which Defendant the United States is responsible, decedent Erick Campbell died.

80.     At all material times, Sergeant Mark Wissner was an investigative or law enforcement officer acting on behalf of a federal agency in an official capacity, in the service of the United States.

81.     Sergeant Wissner caused bodily harm to decedent Erick Campbell by shooting and killing decedent while decedent was in his car. The shooting constituted excessive force and was accomplished without the consent and against the will of decedent Erick Campbell.

82.     As a direct and proximate result of Sergeant Wissner's actions, for which Defendant the United States is responsible, decedent Erick Campbell died.

83.     At all material times, Special Agent Brendan Kenney was an investigative or law enforcement officer acting on behalf of a federal agency in an official capacity, in the service of the United States.

84.     Special Agent Kenney caused bodily harm to decedent Erick Campbell by shooting and killing decedent while decedent was in his car. The shooting constituted excessive force and was accomplished without the consent and against the will of decedent Erick Campbell.

85.     As a direct and proximate result of Special Agent Kenney's actions, for which Defendant the United States is responsible, decedent Erick Campbell died.

86.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

*Count Three: Wrongful Death*

_____

87.     Plaintiffs repeat and re-allege each and every allegation set forth in the prior paragraphs of this Complaint, inclusive, as if fully set forth herein.

88.     As described above, the acts and omissions of the Government's law enforcement agents, acting within the scope of their employment, were negligent and wrongful and did cause the death of decedent Erick Campbell.

89.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

*Count Four: Conscious Pain and Suffering*

90.     Plaintiffs repeat and re-allege each and every allegation set forth in the prior paragraphs of this Complaint, inclusive, as if fully set forth herein.

91.     As described above, the acts and omissions of the Government's law enforcement agents, acting within the scope of their employment, were negligent and wrongful and did cause the death of decedent Erick Campbell.

92.     Upon information and belief, the Government's law enforcement agents' use of lethal force did not cause decedent to immediately expire or lose consciousness. Rather, decedent suffered and experienced a fear of impending death, severe emotional distress, and conscious pain and suffering. The pain and suffering includes the moments decedent waited at the scene for CPR to begin, the moments he waited for an ambulance to arrive, the moments he waited to arrive at the hospital, the moments he was grasping for breath, the moment he realized he was going to expire, and everything in between.

93.     Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

*Count Five: Loss of Love, Support, and Familial Relationships*

94.     Plaintiffs repeat and re-allege each and every allegation set forth in the prior paragraphs of this Complaint, inclusive, as if fully set forth herein.

95.     Plaintiff Robert Campbell is the father of decedent Erick Campbell.

96.     Plaintiff Aida Campbell is the mother of decedent Erick Campbell.

97.     Plaintiff Eric Campbell is the son of decedent Erick Campbell.

98.     Due to the actions and omissions of the Government's law enforcement agents, plaintiffs Robert Campbell and Aida Campbell have been deprived of the love, support and familial relationships of their son, decedent Erick Campbell.

99.     Due to the actions and omissions of the Government's law enforcement agents, plaintiff Eric Campbell has been deprived of the love, support and familial relationships of his father, decedent Erick Campbell.

100.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

*Count Six: Negligent Infliction of Emotional Distress*

101.    Plaintiffs repeat and re-allege each and every allegation set forth in the prior paragraphs of this Complaint, inclusive, as if fully set forth herein.

102.    As described above, the acts and omissions of the Government's law enforcement agents, acting within the scope of their employment, were excessive.

103.    As described above, the acts and omissions of the Government's law enforcement agents, acting within the scope of their employment, were negligent and reckless.

104.    Due to the aforesaid acts and omissions of the Government's law enforcement agents, acting within the scope of their employment, Plaintiffs suffered extreme emotional distress.

105.    The excessive, reckless and/or negligent acts and omissions of the Government's law enforcement agents, acting within the scope of their employment, constituted misconduct of an egregious and outrageous nature that exceeds all bounds usually tolerated by society.

106.    As a direct and proximate result of the foregoing, plaintiffs Robert Campbell, Aida Campbell, and Eric Campbell suffered severe psychological and emotional trauma.

107.    Under the Federal Tort Claims Act, Defendant United States of America is liable for these actions or omissions.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE Plaintiffs demand judgment against the defendant, United States of America, and claim the following damages:

A.  The Estate of Erick Campbell has sustained the following damages:

    a.  Wrongful death and conscious pain and suffering;

    b.  Funeral and burial expenses and other costs incurred as a result of the death of Erick Campbell that have become a charge against his estate or that were paid on his behalf;

    c.  Loss of prospective net estate accumulations; and

    d.  Interest and costs.

B.  Plaintiffs Robert and Aida Campbell, parents of the decedent, have sustained the following damages:

    a.  Loss of love, support, services, and familial relationship of their son from December 15, 2017, plus interest;

    b.  Loss of love, support, services, and familial relationship of Erick Campbell which would have been received by them from their son in the future, with interest thereon, reduced to present value;

    c.  Loss of companionship, instruction and guidance from December 15, 2017, and for the remainder of their lives;

    d.  Great mental pain, anguish, and suffering from December 15, 2017, and for the remainder of their lives; and

       e.  Interest and costs.

C.  Plaintiff Eric Campbell, son and dependent of the decedent, has sustained the following damages:

       a.  Loss of love, support, services, and familial relationship of his father from December 15, 2017, plus interest;

       b.  Loss of love, support, services, and familial relationship of Erick Campbell which would have been received by him from his father in the future, with interest thereon, reduced to present value;

       c.  Loss of parental companionship, instruction and guidance from December 15, 2017, and for the remainder of his life;

       d.  Great mental pain, anguish, and suffering from December 15, 2017, and for the remainder of his life; and

       e.  Interest and costs.

D.  Plaintiffs also demand such other and further relief as this Court deems just, proper, and equitable.

Dated: Brooklyn, New York
       October 11, 2019

                           Respectfully submitted,

                           HELD & HINES, LLP
                           2004 Ralph Avenue
                           Brooklyn, New York 11234
                           (718) 531-9700
                           phines@heldhines.com

                           By: _____*s/ Philip M. Hines*_____
                                 Philip M. Hines, Esq.

                           Attorneys for Plaintiff